NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0615n.06

No. 08-3651

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

**FILED**
**Aug 27, 2009**
LEONARD GREEN, Clerk

| | |
|---|---|
| NEBRA A. SIMPSON, | ) |
| | ) |
| Plaintiff-Appellant, | ) |
| | ) |
| v. | ) ON APPEAL FROM THE |
| | ) UNITED STATES DISTRICT |
| COMMISSIONER OF SOCIAL SECURITY, | ) COURT FOR THE NORTHERN |
| | ) DISTRICT OF OHIO |
| Defendant-Appellee. | ) |

Before:     KEITH, SUTTON, and WHITE, Circuit Judges.

**DAMON J. KEITH**, **Circuit Judge.**     Plaintiff-Appellant Nebra Arlene Simpson ("Simpson") appeals a district court decision affirming the judgment of the Commissioner of Social Security ("Commissioner"), which found that Simpson is not entitled to disability insurance benefits or supplemental security income. On appeal, Simpson contends the Administrative Law Judge ("ALJ"), whose opinion was the Commissioner's final decision: (1) erred when he failed to find that Simpson has severe mental impairments resulting in non-exertional limitations; (2) failed to give the appropriate weight to her treating physicians' opinions; and (3) erred by failing to call a medical expert to testify during the administrative hearing. For the reasons that follow, we reverse the district court's decision with instructions to remand to the Commissioner for further proceedings consistent with this opinion.

**I.**

Simpson was born on October 7, 1970, and was 35 years old at the time of the administrative hearing. She is a high school graduate and worked as a housekeeper from 1993 until 1995, as a dental assistant from 1995 until 2002, and as a home healthcare aide in 2003.

Simpson applied for disability insurance benefits under 42 U.S.C. §§ 416 and 423 on December 23, 2003, and supplemental security income benefits under 42 U.S.C. § 1381 on November 24, 2003, for an injury alleged to have occurred on October 15, 2002. Her claims were initially denied on May 13, 2004, and were denied on reconsideration on August 25, 2004. On September 13, 2004, Simpson timely requested a hearing. The hearing took place before an ALJ on November 1, 2005. The ALJ had the benefit of Simpson's extensive medical record and heard testimony from Simpson, who was represented by counsel, and Evelyn Sindelar ("Sindelar"), who provided vocational expert testimony.

## A. Simpson's Statements and Testimony

### 1. Function Report

On June 13, 2004, Simpson completed a "Function Report" detailing the limitations resulting from her medical conditions, including right side pain, fatigue and nausea. She admitted that she takes care of a cat, has no problem handling her own personal care, remembering to take her medicine, preparing simple meals daily, handling her finances, reading, spending time with others in person and on the phone and getting along with family, friends, neighbors and people in authority.

Simpson noted, however, that she cannot stand or walk for long periods of time and that when she leaves her house, she cannot go alone and rides as the passenger in the car, because her medicine makes her fatigued and dizzy. She also noted that because of the severe pain on the right

side of her body, she has difficulty lifting, climbing stairs, standing, kneeling, walking, squatting, sitting or reaching. She can only walk a few steps before needing to stop and rest. Simpson stated that her concentration comes and goes even though she can finish what she starts. She also can follow spoken and written instructions but has some trouble remembering things due to depression. Her memory for things that took place in the past few days or hours is "fine." She is "tremendously" affected to her detriment by stress and changes in schedule.

## 2. Testimony

During her hearing before the ALJ, Simpson testified about her educational level and her work experience as a housekeeper, dental assistant and home healthcare aide. She also testified to suffering from: chronic right side pain in her right leg, pelvic area and abdomen, endometriosis, daily migraines, diverticulitis, acid reflux, bowel problems, anxiety, and depression. She asserted that the medications she takes cause her to experience dizziness, drowsiness, blurred vision and, sometimes, confusion. Additionally, Simpson explained that the "worst problem[s]" that keep her from working are her hernia and endometriosis, noting that her endometriosis is severe and has required her to undergo surgery every year since 1994. She has bad days, "[f]ive to six days a week," where she "wake[s] up with a severe headache" and "ache[s] all over." On such days, she likes to be alone, and "just lay around." She lives alone in a first-floor apartment.

Simpson additionally testified that her doctor has placed restrictions upon her, as a result of her endometriosis, prohibiting her from "heavy lifting, bending. I can't really walk very far or stand very long. Just minimal everything." She testified to having "a hard time just lifting a gallon of

milk." Simpson's method of dealing with her right side pain is to take medicine and "[a] lot of times . . . to lie down and use an ice pack." She also uses a cane but, even with it, cannot walk a city block.

## B. Medical History

### 1. *Physical*

Simpson's past medical history includes a total abdominal hysterectomy with bilateral salpingo-oophorectomy. Treatment notes prepared by Dr. Thomas W. Wehmann reveal that Simpson had two incisional hernia repairs in her inguinal region in 2000 and 2001 as a result of her hysterectomy.

Beginning in January 2003, Simpson sought treatment for pain in her right hip, pelvic and inguinal areas, after doing some heavy lifting, along with facial pain, shoulder pain and depression, which she had been previously experiencing. She saw a series of doctors throughout 2003 and 2005, who treated her with medication but were unable to cure her of the pain she was experiencing on the right side of her body, particularly in her hip, pelvic and inguinal areas. Notably, on January 5, 2004, Simpson agreed to proceed with surgery to repair what appeared to be a right inguinal hernia. The surgery took place on January 20, 2004, and Dr. Wehmann noted that the surgery revealed "a lot of reaction and scar tissue."

On February 6, 2004, Simpson was admitted to the Cuyahoga Falls General Hospital, with a chief complaint of right inguinal abdominal pain and swelling. She also complained of rectal pain and bleeding. "A CT scan of her abdomen and pelvis revealed a supra rectus muscle abscess," and she underwent a "percutaneous drainage of the abdominal seroma" by general surgery the day she was admitted. Simpson was discharged on February 11, in stable condition, with a series of

medications and an assessment of noninfectious seroma and proctitis. On February 24, 2004, Simpson was again admitted to the Cuyahoga Falls General Hospital still complaining of right lower quadrant pain. She underwent a procedure the next day in which Dr. David Dellinger explored her abdominal wound, drained a hematoma, and excised the entire hematoma pocket found.

On March 19, 2004, Simpson reported to Dr. Garimah Jones that she continued to have pain following her surgery on February 25, 2004. Dr. Jones noted that Simpson was wincing during the interview, sitting very still while holding her side, and clenching her fist during the exam. Dr. Jones prescribed some medication and informed the patient that she was "most likely unable to make her pain free," and so encouraged her to manage and to control her pain.

On April 28, 2004, Dr. Elizabeth Das, a physician for the state agency, reviewed Simpson's file and determined that she was not disabled.

On May 25, 2004, Simpson was again seen by Dr. Jones. Simpson reported that she had been to the pain management clinic at the Cleveland Clinic Foundation six times, was told that she had "nerve entrapment," and stated that "they've done nothing for me." Simpson returned for a follow-up appointment with Dr. Jones on June 18, 2004, and reported that she went to the pain management clinic again and received an intraarticular shot that only lasted for a short time. Based upon this appointment, and the previous ones with Simpson, Dr. Jones filled out a questionnaire from the Social Security Administration ("SSA") describing Simpson's "longstanding history of endometriosis," noting that Simpson is barely able to sit, appears in moderate distress and has diffuse pain to minimal palpitations in her right lower quadrant area. Dr. Jones also noted that Simpson "would be unable to perform any employment that requires prolonged sitting." "She is also unable

to perform changes in position (i.e., bending, lifting)" and her "chronic pain limits her ability to communicate with others."

On August 18, 2004, Dr. David A. Rath, a physician for the state agency, reviewed Simpson's file and determined that she was not disabled.

On September 22, 2004, Dr. Scott Bedwell of St. Vincent Health Center performed the following procedure on Simpson: "excision of mesh versus tumor with repair of resultant hernia using alloderm mesh." During the procedure, Dr. Bedwell found "a wadded mass along the medial aspect of the inguinal canal," and "a very densely adherent loop of small bowel to the undersurface of th[e] mesh which was dissected free." His post-operative diagnosis was a foreign body reaction to implanted mesh or a tumor.

On January 25, 2005, Simpson underwent a diagnostic laparoscopy at Barberton Citizens Hospital, performed by Dr. Stephen D'Abreau, and was diagnosed with chronic pelvic pain and multiple pelvic adhesions, some of which "were intimately associated with bowel and could not be dissected off safely using the laparoscope." Dr. D'Abreau referred Simpson to Dr. Robert Geiger, whom she saw on March 28, 2005. Dr. Geiger assessed that Simpson's right inguinal pain is "probably secondary to neuralgia/neuritis of local nerves trapped within surgical scar tissue," and that her right anterior thigh pain "could be anterior cutaneous nerve of the thigh, but in combination with back pain could be a manifestation of L4 sciatica." Dr. Geiger took charge of ordering Simpson's medication, ordering an MRI of the lumbosacral spine, and recommended that she go to physical therapy. The results of the MRI indicated three mild disc bulges, with mild spinal canal stenosis and an absence of foraminal stenosis.

From April through June 2005, Simpson attended seven physical therapy sessions and " was very pleased with her progress," reporting "it was the most she has ever improved" in physical therapy. On June 2, 2005, Simpson underwent colon surgery performed by Dr. Bedwell, who "found a fairly large defect in [Simpson's] right inguinal area with adhesions going up into the sac . . . and found that the colon was tightly adhesed into the sac right into the femoral canal." As a result of her surgery, Simpson was unable to return to physical therapy for re-evaluation.

Simpson saw Dr. Benson Bonyo from June 2004 through October 2005. On October 5, 2005, Dr. Bonyo completed a "Residual Functional Capacity Questionnaire" for Simpson, in which he opined that Simpson has a severe medical impairment that should limit her ability to do work-related activities and that she should not be "lifting, [carrying,] pushing or bending over 5 [pounds]." In an 8-hour day, Dr. Bonyo stated that Simpson should not sit, stand, walk, or work at all. He stated that Simpson can use her hands for simple grasping and fine manipulation but not for pushing or pulling. He also opined that she cannot use her feet for repetitive movements such as operating foot controls. Dr. Bonyo stated that Simpson could occasionally crawl, reach or kneel but could never bend, squat, climb, stoop, or crouch.

*2. Mental*

On January 30, 2004, Simpson saw Dr. Jones for a physical examination. During her exam, Dr. Jones noted that Simpson had a "flat affect" and seemed to be suffering from depression and/or insomnia for which Dr. Jones prescribed medication. On March 19, 2004, Simpson reported to Dr. Jones that she did not feel her prescribed antidepressant was working, and that she felt "more

anxious." Dr. Jones again noted that Simpson had a flat affect. Dr. Jones increased the dosage of Simpson's medication.

On March 31, 2004, Simpson underwent an examination conducted by Dr. Frederick G. Leidal, a psychologist, "to determine the extent and degree of psychiatric disability as it pertains to social security disability." Dr. Leidal concluded that Simpson has moderate symptoms of depression, anxiety, and a personality disorder with dependent and histrionic features, assigning her a Global Assessment Functioning ("GAF") score of 58. Additionally, Simpson was found to have elevated validity scales and basic clinical scales above 70, based on an assessment completed using the Minnesota Multiphasic Personality Inventory-2, where a score of 70 or above "represents possible emotional, psychological or behavioral concerns that may be impairing to daily functions." Dr. Leidal opined that Simpson's psychological factors likely affect her physical condition, and that "on direct investigation psychological problems may be denied or minimized as the patient wants to be seen as normal due to a high need for social approval."

On April 27, 2004, Dr. Carl Tishler, a psychologist for the state agency, completed a "Medical Residual Functional Capacity Assessment" and "Psychiatric Review Technique" of Simpson that was reviewed and affirmed by Dr. Caroline Lewin, another state agency psychologist, on August 18, 2004. It was noted that Simpson suffers from dysthymia and a personality disorder with dependent and histrionic features, which result in moderate functional limitations. On May 12, 2004, state agency psychologist, Dr. Larry Kravitz, reviewed Dr. Tishler's findings and agreed with them, noting that limiting Simpson to simple, routine work tasks was reasonable.

On June 2, 2004, Simpson was seen by Dr. Connie McReynolds of Northeast Ohio Behavioral Health, Ltd. for individual psychotherapeutic treatment. Dr. McReynolds diagnosed Simpson with an adjustment disorder with mixed anxiety and depressed mood. Simpson returned for two additional sessions on June 9 and June 30 before discontinuing treatment. Dr. McReynolds noted that Simpson did not make any progress due to her failure to return.

As noted above, Simpson saw Dr. Bonyo from June 2004 through October 2005 for a series of issues, including depression and anxiety. During an appointment in October 2005, Simpson reported that her anxiety level and depression had become more severe in the past week, and that she had experienced two anxiety attacks that week. Dr. Bonyo treated Simpson's complaints by increasing the dosage of her medication.

## C. Vocational Expert Testimony

In addition to Simpson's testimony and her medical record, the ALJ heard testimony from Vocational Expert Sindelar. Sindelar was asked a series of hypothetical questions, such as whether a person with the age, education, and work background of Simpson, capable of medium work with the ability to sit or stand as needed, would be able to perform any of Simpson's past relevant work. Sindelar stated "[n]o," not as Simpson performed the jobs, but noted that Simpson could work as a home health aide or a dental assistant as the jobs were generally performed in the national economy. Sindelar further opined that Simpson could also perform other work at the medium exertional level, such as working as a childcare monitor in a home or a hospital tray person.

Sindelar was then asked about a hypothetical person of Simpson's age, education, and work background who was limited to light work and needs the ability to sit or stand as needed. Sindelar

stated that Simpson could work as a dental assistant, a housekeeper, a bench assembler, or a gasket inspector.

The ALJ then asked Sindelar whether a hypothetical person of Simpson's age, education and work background who was limited to sedentary work and needs the ability to sit and stand as needed could perform any of Simpson's past relevant work as she performed it or as it is generally performed in the national economy. Sindelar responded "no" but that she could work as a dowel inspector, a table worker, or a lens block gager.

On cross-examination, Sindelar conceded that a person who is restricted from lifting over five pounds could not perform any of the jobs previously mentioned, including the sedentary work. The hypothetical person would also be unable to perform any of the previously mentioned jobs if she uses a cane to stand, could not be involved in any production quotas or repetitive work, and was moderately limited in her ability to maintain persistence and pace. Sindelar later admitted that all of the named jobs require this hypothetical person "to be on task."

### D. The ALJ's Decision

In a written decision, dated February 17, 2006, the ALJ affirmed the agency's reconsidered decision that Simpson is not disabled and, therefore, not entitled to a period of disability and disability insurance benefits nor was she eligible for supplemental security income payments. Although the ALJ found that Simpson did suffer from severe physical impairments of status post right colon resection and repair of right inguinal hernia, the ALJ further found that Simpson had the residual functional capacity to perform light work, with limitations, and that she remains capable of performing her past relevant work as a dental assistant and a housekeeper. In reaching this decision,

the ALJ also found that Simpson's adjustment disorder and anxiety disorder were not severe, that Simpson's allegations regarding her limitations were not totally credible, and that the opinions of Drs. Jones and Bonyo were not entitled to controlling weight. On November 6, 2006, the Appeals Council denied Simpson's request for review, which rendered the ALJ's decision the Commissioner's final one. *See* 20 C.F.R. §§ 404.981and 416.1481.

### E. District Court

On November 27, 2006, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), Simpson filed a complaint in the United States District Court for the Northern District of Ohio, arguing that the Commissioner's finding that she is not disabled was not based upon substantial evidence. The magistrate judge issued a report and recommendation dated August 20, 2007, in which he recommended on the basis of two of Simpson's seven claims of error that the case be reversed and remanded "given [Simpson's] medical history [which calls] for testimony by a medical expert on the question of [her] subjective complaints vis-a-vis [sic] the objective medical evidence, and that the ALJ erred in making a judgment in this regard without the benefit thereof." The magistrate judge also found this "error . . . compounded by the fact that the ALJ chose to reject the opinions of two of [Simpson's] treating physicians . . . that support her position."

The Commissioner filed objections to the magistrate judge's report and recommendation. The district court issued an order on March 14, 2008, rejecting the magistrate judge's report and recommendation and affirming the Commissioner's denial of benefits, based on its finding that the record before the ALJ was complete and contained substantial evidence to support the ALJ's findings.

Simpson timely appealed. (ROA 99).

**II.**

We review district court decisions in social security cases *de novo. Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Appellate courts "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Id.* (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)). Rather, judicial review is limited in scope to determining whether the Commissioner's findings of fact are supported by substantial evidence, based on the record as a whole, and whether the proper legal criteria were employed. 42 U.S.C. § 405 (g); *see also Jordan*, 548 F.3d at 422. Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations and internal quotation marks omitted); *see also Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (citing *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)). If supported by substantial evidence, this Court will defer to a Commissioner's decision, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Longworth v. Comm'r SSA*, 402 F.3d 591, 595 (6th Cir. 2005) (citations and internal quotation marks omitted).

Under the Social Security Act, a person qualifies for disability insurance benefits and supplemental security income when she has a disability defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* § 1382c(a)(3)(A).

To determine whether one is disabled, the Commissioner has developed a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003).

At step one, if a claimant can perform substantial gainful activity, she is not considered disabled. 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a)(4)(i). At step two, if a claimant does not have a severe medically determinable physical or mental impairment (*i.e.*, a condition that significantly limits her physical or mental ability to do basic work activities) that meets the duration requirement in § 404.1509 (longer or expected to be longer than a continuous period of at least 12 months), or a combination of impairments that is severe and meets the duration requirement, then she is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii) and (c). At step three, a claimant will be considered disabled if she has an impairment that meets or equals one of the Commissioner's listings and the duration requirement. 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii). Between steps three and four, the Commissioner assesses the claimant's residual functional capacity ("RFC"), which is the most a claimant can do despite her limitations. 20 C.F.R. §§ 404.1545 and 416.945. At step four, the Commissioner will determine, based on the claimant's RFC and past relevant work, that she is not disabled if she can still perform her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.920(a)(4)(iv). Finally, at step five, the Commissioner assesses the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v). If not, she is considered disabled. 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v).

Here, Simpson contends that the ALJ: (1) erred at step two when he failed to find that Simpson has severe mental impairments resulting in non-exertional limitations; (2) failed to give the appropriate weight to her treating physicians' opinions; and (3) erred by failing to call a medical expert to testify during the administrative hearing. We first discuss Simpson's challenge to the ALJ's failure to call a medical expert and then turn to her other two claims of error. We conclude that because the ALJ indeed erred at step two and did not rely upon substantial evidence in dismissing the opinions of Simpson's treating physicians, we must reverse the district court's decision with instructions to remand the case to the Commissioner for reconsideration.

### A. Medical Expert

Simpson's first argument is that the ALJ erred by failing to adequately develop the record because he failed to call a medical expert to properly interpret the medical evidence and to explain alleged inconsistencies between the findings of Simpson's treating physicians and the state agency doctors. The magistrate judge similarly found that "given the plaintiff's medical history this is a case that called for testimony by a medical expert . . . [because this] Court possesses the same 'medical expertise' as does the ALJ, and has no idea whether the plaintiff's pain complaints are reasonably accounted for by adhesions . . . and/or inguinal nerve entrapment . . . . " The district court, however, disagreed and citing the extensive medical record provided to and reviewed by the ALJ held that, without any request from Simpson or her counsel for medical expert testimony, the ALJ reasonably concluded that the record was complete.

An ALJ has "the ultimate responsibility for ensuring that every claimant receives a full and fair hearing . . . . " *Lashley v. Sec'y of H.H.S.*, 708 F.2d 1048, 1051 (6th Cir. 1986); *see also*

*Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993) (stating that "[h]ow much evidence to gather is a subject on which district courts must respect the Secretary's reasoned judgment"). Additionally, 20 C.F.R. §§ 404.1527(f)(2)(iii) and 416.927(f)(2)(iii) provide discretion rather than a mandate to the ALJ to decide whether to solicit medical expert testimony, stating that ALJs "may . . . ask for and consider opinions from medical experts on the nature and severity of [a claimant's] impairment(s) . . . ." *See Davis v. Chater*, 104 F.3d 361 (table), 1996 U.S. App. LEXIS 33614, at *6 (6th Cir. Dec. 19, 1996) (finding 20 C.F.R. §§ 404.1427(f)(2) and 416.927(f)(2) (1996) specifically give an ALJ discretion to decide whether to call a medical expert).

In *Allison v. Apfel*, a case in which the claimant was without counsel, this Court held that the record was fully developed, where the claimant himself was the only one who testified at the hearing before the ALJ, and the record contained reports from two psychologists and a psychiatrist. 2000 U.S. App. LEXIS 22689, at *17 (6th Cir. 2000); *see also Kendrick*, 998 F.2d at 456-58 (noting that a record is never really complete but "taking 'complete record' literally would be a formula for paralysis, undermining all of the objectives of simplified procedure"). This Court has also previously found that an ALJ "properly determined that the record contained sufficient evidence to decide [a claimant's] disability claims absent expert medical testimony because the record contained [the claimant's] extensive medical history." *Williams v. Callahan*, 1998 U.S. App. LEXIS 10777, at *10 n.3 (6th Cir. May 26, 1998).

Here, the ALJ had Simpson's extensive medical history, testimony as to her daily activities, testimony from a vocational expert, and the reports from Simpson's treating physicians, as well as reports from state agency doctors. Therefore, given the breadth and depth of the evidence in the

record, and this Court's deference to the ALJ in deciding whether the record is fully developed, we find the ALJ did not err in failing to call a medical expert.

## B. Mental Impairments

Next, Simpson challenges the ALJ's finding that she did not have severe non-exertional limitations. She seeks reversal and remand to the Commissioner for reconsideration of her RFC.

An impairment is not considered severe when it "does not significantly limit [one's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a) and 416.921(a). Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," and include: (1) physical functions; (2) the capacity to see, hear and speak; (3) "[u]nderstanding, carrying out, and remembering simple instructions"; (4) "[u]se of judgment"; (5) "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and (6) "[d]ealing with change in a routine work setting." 20 C.F.R. §§ 404.1521(a) - (b) and 416.921(a) - (b). Step two "has been described as 'a *de minimis* hurdle'; that is, 'an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.2 (6th Cir. 2007) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). "The goal of the test is to 'screen out totally groundless claims.'" *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)).

Concerning Simpson's mental impairment, an adjustment disorder with mixed anxiety and depressed mood, the ALJ found that Simpson "responded well to medication and has essentially no significant limitations from this mental impairment," because she had "no restriction of activities

of daily living, no difficulties in maintaining social functioning, and no difficulties in maintaining concentration, persistence or pace from her mental impairment." The ALJ additionally found that Simpson did not suffer "any episodes of decompensation of extended duration." Accordingly, the ALJ found that Simpson's mental impairment was not severe and would not be considered in assessing her RFC.

We find the ALJ erred. This Court has previously found it "legally irrelevant" that some of a claimant's impairments were considered non-severe, when others were found to be severe, because a finding of severity as to even one impairment clears the claimant of step two of the analysis and should cause the ALJ to consider both the severe and non-severe impairments in the remaining steps. *Astrue*, 266 F. App'x at 457 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)). In other words, "[o]nce one severe impairment is found, the combined effect of all impairments must be considered, even if other impairments would not be severe." *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787 (6th Cir. 2009) (referencing 20 C.F.R. §§ 404.1523 and 404.1545(a)(2)).[1] Therefore, once it was determined that Simpson suffered from severe physical impairments, status post right colon resection and repair of right inguinal hernia, the ALJ was

---

[1]Pursuant to 20 C.F.R. §§ 404.1523 and 416.923: "In determining whether your physical or mental impairment or impairments are of a sufficient medical severity . . . we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process."

Pursuant to 20 C.F.R. §§ 404.1545(a)(2) and 416.945(a)(2): "If you have more than one impairment. We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§ 404.1520(c), 404.1521, and 404.1523, when we assess your residual functional capacity."

required to consider the impairments resulting from this condition and her adjustment disorder with anxiety and depression in assessing her RFC. Instead, the ALJ held that "based on my evaluation of the claimant's mental impairment as not a severe impairment . . . she does not have any limitations stemming from that mental impairment." The ALJ's finding is contrary to controlling law.

Further, the ALJ's mischaracterization of Simpson's limitations (or lack thereof) warrants a finding that the ALJ's decision is not based on substantial evidence. In *White*, a factually similar case, the claimant was diagnosed with an adjustment disorder and depression, and assigned a GAF score of 55, indicating moderate symptoms. *White*, 312 F. App'x at 787. We ultimately found a lack of substantial evidence to support the ALJ's total discounting of the claimant's mental impairments because the ALJ did not "accurately state the evidence used to support his finding." *Id.* at 787-88. *White* held as much *despite* evidence that there were no limitations caused by the claimant's mental impairments. *Id.* Here, in a contrast of facts, the ALJ found that Simpson did not suffer *any* limitations from her mental impairment despite uncontradicted objective medical evidence that she suffered from such limitations. Dr. Leidal opined that Simpson's "level of psychological stress is very likely to have an effect on daily living," and that her ability to work is moderately impaired. He found Simpson slightly impaired in her ability to work near, and not be overly distracted by, others and in her persistence in completing routine daily tasks and keeping pace. It was also found that she was slightly to moderately impaired in her adaptability and in her ability to sustain an ordinary routine without supervision or prompting. Simpson was further found to be moderately impaired in her ability to understand, comprehend, and carry out more complex levels of instruction

and direction, maintain employment, adapt to the work environment, tolerate the stressors of the work environment and complete a normal work day.

Additionally, Dr. Tishler opined that Simpson is moderately impaired in her ability to understand, remember and carry out detailed instructions, interact appropriately with the general public, respond appropriately to changes in the work setting, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. Further, Dr. Tishler found that Simpson was moderately limited by her restriction of activities of daily living, her difficulties in maintaining social functioning, and her difficulties in maintaining concentration, persistence or pace. Dr. Lewin reviewed and affirmed Dr. Tishler's assessment of Simpson. Dr. Kravitz, another state agency doctor, also reviewed both of Dr. Tishler's assessments and agreed that it was reasonable to limit Simpson to "simple, routine, work tasks." Accordingly, this uncontradicted objective medical evidence demonstrates that Simpson suffered a series of limitations because of her mental disorder, and the ALJ's finding that she suffered no limitations was a clear mischaracterization of the facts.

We are therefore compelled to reverse the district court's judgment because it affirmed the ALJ's improper calculation of Simpson's RFC, which informed the hypothetical question, whose answer the ALJ relied upon to determine that Simpson could work. We held in *Howard* that the "hypothetical question posed to a [vocational expert] for purposes of determining whether [claimant] can perform other work . . . should include an accurate portrayal of her individual physical and mental impairments." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (citations and internal quotation marks omitted); *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th

Cir. 2004) (discussing *Howard* and noting that "a denial of benefits based upon an ALJ's improper calculation of a claimant's residual functional capacity . . . must be reversed"). Failing to incorporate Simpson's demonstrated mental impairments into her RFC requires us to conclude that the ALJ's finding that Simpson is not disabled is not supported by substantial evidence.

Nonetheless, the Commissioner wants this Court to find that even if Simpson's limitations resulting from her mental impairments should have been included in the ALJ's RFC calculation, a remand would be frivolous because the record shows Simpson could perform work as a housekeeper, along with significant other jobs where one has simple, repetitive work limitations. The Commissioner cites *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) quoting *NLRB v. Wyman*, 394 U.S. 759, 766 n.6 (1969), in support of its argument that courts are not required to remand where it "would be an idle and useless formality."

Remanding this case is not a mere formality, as it "would propel [our Court] into the domain which Congress has set aside exclusively for the administrative agency," if we were to determine the jobs available to Simpson based upon her limitations. *SEC v. Chenery Corp.,* 332 U.S. 194, 196 (1947); *see also Williams v. Comm'r of Soc. Sec.*, 227 F. App'x 463, 464 (6th Cir. 2007). Instead, the ALJ must make this determination. Where an "administrative agency alone is authorized to make" a particular determination, the reviewing court "must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." *Chenery*, 332 U.S. at 196. We are therefore compelled to remand this case for reconsideration.

### C. Treating Physician's Opinions

Lastly, Simpson asserts the ALJ did not establish adequate grounds on which to discount the opinions of her treating physicians, Drs. Bonyo and Jones. An ALJ is generally required to give a treating physician's opinion controlling weight "if the opinion of the treating physician as to the nature and severity of a claimant's conditions is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record . . . . " *Rogers*, 486 F.3d at 242; *see* 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (discussing the weight to be given a treating physician's opinion). Even when not given controlling weight, the opinions of treating physicians are entitled to deference. "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." S.S.R. 96-2p (1996), 1996 S.S.R. LEXIS 9, at **9-10. This is so:

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).

If not accorded controlling weight, the ALJ must consider a series of factors in determining the weight to be accorded the treating physician's opinion, including: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir.

2004); *see also Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009). Additionally, the ALJ "must provide good reasons for discounting treating physicians' opinions, reasons that are sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (citations and internal quotation marks omitted).

### 1. Dr. Jones's Opinion

Here, the ALJ determined that Dr. Jones's opinion was not entitled to controlling weight because the opinion was "not supported by this physician's own treatment notes wherein all examinations have been essentially normal." The ALJ further held that Dr. Jones's treatment of Simpson was mostly routine, primarily for sinus problems and dyspepsia, and that Dr. Jones had prescribed an anti-depressant to Simpson "for feelings of depression." Simpson contends on appeal that Dr. Jones' opinion is "entirely consistent" with her treatment notes.

Further, the Commissioner argues that Dr. Jones's opinion was conclusory and inconsistent with the record evidence, and that "[e]ach of the findings cited by Dr. Jones was an observation of Simpson's own subjective pain behaviors." Even assuming, *arguendo*, that Dr. Jones's statements are conclusory, the ALJ's finding as to Dr. Jones's opinion is flawed in that the ALJ either mischaracterized the evidence or failed to review Simpson's complete record. The ALJ suggests that Dr. Jones's treatment of Simpson was mostly routine, primarily for sinus problems and dyspepsia. The record, however, reveals treatment notes from Dr. Jones beginning in December of 2002 and through June of 2004. Of the ten notes pertaining to the ten documented visits during this time period, seven of the visits concerned Simpson's chronic pelvic pain and Dr. Jones's attempts to help

Simpson manage and control said pain. It is unclear, therefore, what evidence the ALJ relied upon or if he reviewed her complete record in finding that Dr. Jones mainly treated Simpson for sinus problems and dyspepsia. Consequently, the ALJ's finding is not based upon substantial evidence.

Additionally, as the magistrate judge soundly reasoned "[a] fair reading of Dr. Jones [sic] records reflects that she treated her patient on the basis that the patient's pain complaint [sic], were real and sound, and those notes do not reflect 'essentially normal' examinations." It is indeed unclear why and with what evidence the ALJ found that Dr. Jones's notes reflect normal examinations. Accordingly, the ALJ's decision to reject Dr. Jones's opinion is not supported by substantial evidence. *See Wilson*, 378 F.3d at 544; *see also Bass v. McMahon*, 499 F.3d 506, 509-10 (6th Cir. 2007).

### 2. Dr. Bonyo's Opinion

Additionally, the ALJ found Dr. Bonyo's conclusions to be "so extreme as to be implausible," because Dr. Bonyo "completed a form stating that the claimant is totally unable to sit, stand, walk, work, lift, push/pull, bend, squat, climb, stoop or crouch in an 8 hour day." Moreover, the ALJ found it "inconceivable that this claimant who has had pain due to pelvic adhesions with otherwise normal examinations would be completely unable to move or do anything at all." The ALJ also found that "even taking the claimant's pain into consideration, Dr. Bonyo's notes fail to show findings that would preclude the claimant from performing at least light work activity." The magistrate judge found this latter statement to constitute a medical judgment the ALJ was not qualified to make. The district court, however, disagreed, holding that "substantial evidence exists to support the ALJ's finding that Dr. Bonyo's opinion is inconsistent with the record as a whole."

Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite impairment(s), and [her] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2) and 416.972(a)(2); *Bass*, 499 F.3d at 510. "The ALJ is not bound to accept the opinion or theory of any medical expert, but may weigh the evidence and draw his own inferences." *McCain v. Dir., OWCP*, 58 F. App'x 184, 193 (6th Cir. 2003) (citing *Underwood v. Elkay Mining*, 105 F.3d 946, 951 (4th Cir. 1997)). In weighing medical expert opinions, the ALJ is required to consider their quality and, thus, "should consider the qualifications of the experts, the opinions' reasoning, their reliance on objectively determinable symptoms and established science, their detail of analysis, and their freedom from irrelevant distractions and prejudices." *Underwood*, 105 F.3d at 951. Nonetheless, an ALJ "may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence." *Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006); *see also Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (stating "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings").

In the instant case, the ALJ's statements as to the implausibility of Dr. Bonyo's findings constitute a medical judgment the ALJ was not qualified to make. The ALJ based the implausibility of Dr. Bonyo's medical opinion on the ALJ's independent determination that "[i]t is inconceivable that this claimant who has had pain due to pelvic adhesions with otherwise normal examinations would be completely unable to move or do anything at all." Ultimately, the ALJ substituted Dr.

Bonyo's medical opinion with his own in determining the degree of pain resulting from the condition from which Simpson suffers, and did not merely rely upon her testimony as to her daily activities or another doctor's testimony as to her condition. Therefore, the ALJ's rejection of Dr. Bonyo's opinion did not rest upon substantial evidence.

### III.

In sum, while the ALJ did not err in finding that the record was fully developed, the ALJ did err in failing to incorporate Simpson's significant mental impairments into the calculation of her RFC, and the ALJ did not rely upon substantial evidence in discounting the opinions of Simpson's treating physicians. Accordingly, we reverse the judgment of the district court with instructions to remand to the Commissioner for further proceedings consistent with this opinion.