NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0274n.06

Case No. 23-2036

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| USHEIL ACQUINETTA FLOYD, | ) | **FILED**<br>Jun 24, 2024<br>KELLY L. STEPHENS, Clerk |
| Plaintiff-Appellant, | ) |  |
| v. | ) | ON APPEAL FROM THE UNITED |
|  | ) | STATES DISTRICT COURT FOR |
| COMMISSIONER OF SOCIAL SECURITY, | ) | THE EASTERN DISTRICT OF<br>MICHIGAN |
| Defendant-Appellee. | ) |  |
|  | ) | OPINION |

Before: SILER, MOORE, and KETHLEDGE, Circuit Judges.

**SILER, Circuit Judge.** In 2018, Usheil Floyd applied for Social Security disability benefits, claiming that she became disabled on July 26, 2017. After several proceedings, including a reversal by the Social Security Administration Appeals Council, she successfully secured part of the benefits she requested. However, the Administrative Law Judge ("ALJ") found that Floyd's disability began on December 9, 2020, and refused to award benefits for the period from July 26, 2017, to December 9, 2020. Her appeal of this decision was dismissed by the Appeals Council, and the district court dismissed her subsequent action on motion for summary judgment by the Commissioner. She now appeals, arguing that the ALJ fundamentally misunderstood the evidence and failed to properly conduct the proceedings. Finding no error, we affirm.

I.

Floyd, who, ironically, worked for the Social Security Administration as a Senior Case Technician, applied for Social Security disability benefits in May 2018. She alleged disability

based on depression, anxiety, panic attacks, endometriosis, osteoarthritis in her knees, osteoporosis, vitamin D deficiency, HIV, tuberculosis, and high blood pressure. Her application was denied based on lack of disability, and an ALJ upheld that decision. Floyd appealed the ALJ's decision, and the Appeals Council vacated and remanded on grounds not relevant here.

On remand, the ALJ held a hearing and heard testimony from Floyd and a vocational expert. In the subsequent order, the ALJ partially granted Floyd's application for benefits. However, the ALJ found that Floyd was not disabled beginning on July 26, 2017, as she had contended, but that her disability instead began on December 9, 2020. Floyd timely appealed this partial victory, and her request for review was denied.

Floyd commenced an action in the district court challenging the Commissioner's decision on her application for benefits. The parties filed cross motions for summary judgment. The magistrate judge recommended that the district court grant the Commissioner's motion and deny Floyd's. The district court adopted the magistrate judge's recommendation over her objection. This appeal followed.

## II.

We "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)). When reviewing for substantial evidence, we do "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Instead, "tak[ing] into account whatever in the record fairly detracts from [the] weight" of the ALJ's decision, we examine whether a "reasonable mind" looking at the record

before us could come to the same conclusion as the ALJ. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002).

Floyd claims that the ALJ made three errors in analyzing her claim. First, that it misinterpreted diagnostic test results evaluating her osteopenia and osteoporosis, resulting in the ALJ attributing to her a higher residual functional capacity ("RFC") than she really had. Second, she argues that the ALJ erred by not calling an expert to testify about the diagnostic tests. And finally, she argues that the ALJ failed to reconcile its RFC decision with the vocational expert's testimony that certain jobs were available to her in the national economy, when some of them required capabilities outside her RFC.

### A. Floyd failed to demonstrate error at step two of the analysis.

To be eligible for disability benefits, Floyd must show that she is disabled. 42 U.S.C. § 423(a)(1)(E). Disability is defined by the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1)(A). Agency regulations establish a "five-step sequential evaluation process" to decide whether an applicant is disabled. 20 C.F.R. § 404.1520(a)(1). A conclusive finding in favor of or against disability at any step ends the analysis. *Id.* § 404.1520(a).

First, Floyd must not be engaged in "substantial gainful activity." *Rabbers*, 582 F.3d at 652 (citing 20 C.F.R. § 404.1520(a)(4)(i)-(v)). Second, she must show she has a "severe medically determinable physical or mental impairment." *Id.* Third, once the impairment is proven, she must show that the impairment "meets or equals" a listed impairment in the regulations. *Id.* Between steps three and four, the ALJ will assess Floyd's RFC to determine what remaining capability she

has to work. *See id.* Fourth, she must not be able to do her "past relevant work." *Id.* And fifth, if Floyd bears her burden on steps 1 through 4, then the burden shifts to the Commissioner to show other jobs exist that she can perform. *Id.*

In evaluating her claim at step two of the analysis, the ALJ determined that Floyd's osteoporosis and osteopenia were not a medically determinable impairment that affected her ability to work. Specifically, the ALJ determined that two diagnostic imaging scans showed "average bone mineral density." But this was incorrect; the scans instead showed bone density in the osteoporotic and osteopenic range. The phrase quoted by the ALJ came in the context of a report stating that Floyd's "average bone mineral density is 0.749 g/cm$^2$, with T-score of -3.6." This was not a statement that Floyd had "average bone mineral density." Quite the contrary; it was a statement that her average bone mineral density was in the osteoporotic range. Nevertheless, the ALJ found that Floyd suffered from other severe impairments and proceeded with the analysis on those grounds, finding that her osteoporosis and osteopenia were not "severe."

Floyd argues that her osteoporosis and osteopenia were severe impairments necessitating a much more restrictive RFC finding. In her telling, this "misrepresentation" by the ALJ was the type of error that occurs "where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651. But this contention ignores several legal issues with her argument on appeal.

First, though an ALJ must consider all evidence, an ALJ does not have to specifically address every piece of evidence in his written decision to be upheld on appeal. *See Loral Defense Systems-Akron v. NLRB*, 200 F.3d 436, 453 (6th Cir. 1999). As the district court noted, "[t]he measure of adequacy is not whether Plaintiff is satisfied with a magistrate judge's conclusion, but whether it is grounded in law."

Second, while it is true that the severity determination at step two is easily satisfied, if the ALJ finds another impairment to be severe and proceeds with the five-step analysis, we will not reverse. *See Fisk v. Astrue*, 253 F. App'x 580, 583–84 (6th. Cir. 2007) (quoting *Maziarz v. Sec'y of Health and Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)). This is because agency rules require the ALJ to consider even non-severe impairments in the remaining analysis. SSR 96-8P ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"); *Fisk*, 253 F. App'x at 583. Therefore, severe or not, Floyd's osteoporosis and osteopenia were considered to some degree in the subsequent disability analysis, as the district court pointed out, and any error at step two was harmless to Floyd.

Finally, Floyd assumes that simply pointing out the ALJ's mistake is enough to bear her burden to show disability. But it is not enough to show that two bone density scans showed osteoporotic bone density—she must show that she was *disabled*. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (per curiam) ("The mere diagnosis of [a condition], of course, says nothing about the severity of the condition."). Instead, her brief cites many theoretical sources, some of them outside the record, showing that osteoporosis can be painful and could have affected her. She cites no evidence from the record to show that not only was the ALJ wrong about the severity of her osteoporosis and osteopenia, but that she was disabled by it. And as the Commissioner points out, only one of the medical opinions in the agency record attributes any physical limitations to osteoporosis. The state Medicaid agency's doctors found many limitations, none of them caused by osteoporosis, and neither did the consultative examiner, Doctor Shaw. Floyd's own primary care physician attributed all her troubles to, at various times, degenerative joint disease, arthritis, and osteoarthritis. Doctor Dhar, an infectious disease specialist, was the sole exception.

She attributed Floyd's difficulty lifting, carrying, and using her hands to her osteoporosis, but also mistakenly stated that Floyd had fractured her arm as it was then in a cast (in fact, it was merely sprained and in a splint). Further, Floyd refers to fractures that she suffered, but there is no evidence of them in the record and they predate her alleged disability onset date. And finally, her course of medication for osteoporosis does not suggest the urgency one would expect from a severe and limiting condition. She began taking Alendronate in 2005 and took it intermittently due to kidney stones and simply forgetting to take it, and at one point her doctor switched her to an injectable treatment.

Taken together, we cannot say that the ALJ erred sufficiently to require reversal. While the ALJ undoubtedly misread the diagnostic test results, Floyd has failed to show how this error prejudiced her or made a difference in the eventual determination of her disability.

### B.     The ALJ was not required to obtain expert testimony.

Next, Floyd complains that the ALJ did not secure an expert to testify about the diagnostic imaging tests. She grounds her complaint in two Social Security Rulings, SSR 96-6p and 16-3p. But the first of those Rulings, SSR 96-6p, was rescinded and replaced on March 27, 2017, before her application was filed or her alleged disability began. And the second, SSR 16-3p, discusses experts twice, and only in a permissive sense, and not a prescriptive one. In other words, the Ruling does not require the ALJ to use an expert but merely states that the agency "may ask for and consider evidence from a medical or psychological expert to help [] determine whether an . . . impairment could reasonably be expected to produce [the applicant's] symptoms." SSR 16-3p.

There is no per se rule that an ALJ must use an expert witness to assist with medical evidence. 20 C.F.R. § 404.1513a(b)(2) ("Administrative law judges *may* also ask for medical evidence from expert medical sources." (emphasis added)). On the contrary, an "ALJ has

discretion to determine whether additional evidence is necessary." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010). And we have previously affirmed an ALJ's decision not to call for expert testimony where the record was sufficiently voluminous, including the applicant's "extensive medical history, testimony as to her daily activities, testimony from a vocational expert, and the reports from [the applicant's] treating physicians, as well as reports from state agency doctors." *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 189 (6th Cir. 2009). All the evidence that existed in *Simpson* exists in this case as well, and the record before us is over 800 pages. Floyd's argument that the ALJ was required to call an expert witness is without merit.

**C.      The ALJ did not err by failing to reconcile Floyd's RFC with the cited jobs.**

Finally, Floyd argues that the ALJ erred by accepting the vocational expert's testimony that her RFC allowed her to perform certain jobs, even though her stated RFC did not completely match the RFC within the job descriptions. This argument also fails.

At step five of the analysis, the ALJ found that Floyd "had the residual functional capacity to perform medium work as defined in 20 C.F.R. § 404.1567(c)" with a number of exceptions. At the final hearing, the ALJ called an expert to testify to what jobs Floyd could reasonably perform given her RFC, and whether those jobs existed in a sufficient number in the national economy. The expert's testimony was based on the national economy and number of jobs available, and consistent with the Dictionary of Occupational Titles ("DOT") job descriptions.

An ALJ is entitled to rely on expert testimony in making a finding at step five. *Conn v. Sec'y of Health & Hum. Servs.*, 51 F.3d 607, 610 (6th Cir. 1995) (stating that "the ALJ may rely on the testimony of the vocational expert"). "All that is required before an ALJ can rely on vocational evidence provided by a vocational expert is that the ALJ either ensure that the evidence does not conflict with the information in the DOT or obtain a reasonable explanation for any

conflict." *O'Neal v. Comm'r of Soc. Sec.*, 799 F. App'x 313, 317 (6th Cir. 2020). As discussed above, that was done here before testimony even began.

The vocational expert testified that Floyd could perform the representative jobs of counter supply worker, meat clerk, and spray-painting machine operator, all of which are medium exertion occupations. Floyd argues that this was incorrect because she has special limitations on her medium-work RFC which foreclose these jobs, specifically the limitation to "frequent handling and fingering" and "occasional" stooping. However, all these jobs meet the "frequent handling and fingering" limitation according to the agency's DOT. *See* DOT 319.687-010, 1991 WL 672772; DOT 222.684-010, 1991 WL 672129; DOT 741.685-010, 1991 WL 680248. And only one, the counter supply worker job, requires frequent stooping in contravention of her occasional stooping limitation; the rest meet her modified medium-work RFC. *See* DOT 222.684-010, 1991 WL 672129; DOT 741.685-010, 1991 WL 680248. As discussed, the ALJ is entitled to rely on expert testimony, but even assuming error regarding the counter supply worker job, there are approximately 110,000 meat clerk and spray-painting machine operator jobs in the national economy. This easily meets the threshold for determining that sufficient jobs exist to deny disability benefits. *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022) (finding 32,000 jobs sufficient). We have "repeatedly held" that expert testimony identifying suitable jobs available to the applicant "can constitute substantial evidence" on appellate review. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 549 (6th Cir. 2004).

AFFIRMED.