NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0615n.06
Filed: July 20, 2005

**No. 04-3833**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

THOMAS E. BELL,

      **Plaintiff-Appellant,**

v.

JO ANNE B. BARNHART,
Commissioner of Social Security,

      **Defendant-Appellee.**
_____/

            **On Appeal from the
United States District
Court for the Southern
District of Ohio**

BEFORE: BOGGS, Chief Judge, and GIBBONS, Circuit Judge; QUIST, District Judge.[*]

      **GORDON J. QUIST, District Judge**. Plaintiff-Appellant Thomas E. Bell ("Bell") appeals

from the order of the district court denying his Social Security claim and granting summary

judgment to Defendant-Appellee Commissioner of Social Security ("Commissioner"). For the

reasons that follow, we AFFIRM the judgment of the district court.

**I. Background**

      Bell filed an application for Social Security Disability Benefits on January 14, 2000, alleging

that he became disabled on February 27, 1999, due to severe back, leg, and knee pain. The Social

Security Administration ("SSA") denied Bell's application through the initial stages of

administrative review, and Bell made a timely request for a hearing before an administrative law

judge ("ALJ"). Following an adjournment of the initial hearing on October 5, 2000, a full hearing

_____

[*]The Honorable Gordon J. Quist, United States District Judge for the Western District of
Michigan, sitting by designation.

was held on May 4, 2001, before ALJ Barry Anderson. The ALJ issued a written opinion concluding that Bell was not disabled under the Social Security Act. The Appeals Council denied Bell's request for further review on March 21, 2003, making the ALJ's decision the final decision of the Commissioner.

Bell filed an action in the district court seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). On March 19, 2004, the magistrate judge issued a report and recommendation that the Commissioner's motion for summary judgment be granted and the ALJ's decision affirmed. Bell filed objections, and on June 2, 2004, the district judge overruled the objections and affirmed the ALJ's decision. This appeal followed.

Bell was 53 years old at the time of the ALJ's decision. Bell is a high school graduate and completed one semester of college. He served in the military for two years, served as a village council member and as village mayor for six years until 1993, and worked as a union organizer for several years. Bell last worked in February of 1999, when he alleges he became disabled due to a lower back injury. Prior to that time, Bell was employed by a mining company. He worked as an underground locomotive operator and later as a rotary dump operator.

Prior to the alleged onset of his disability, Bell underwent two surgeries on his left knee, a surgery on his right knee, and a surgery on his right ankle. He also suffered a work-related back injury in 1997. An October 1997 lumbar spine magnetic resonance imaging ("MRI") scan performed in connection with the injury revealed a disc herniation with right nerve impingement. However, neurosurgeon Jack Wilberger, M.D., who treated Bell for the injury, disagreed with the radiologist's interpretation and believed that it was a bulging disc rather than a herniation.

2

At the hearing before the ALJ, Bell testified that he has trouble standing for any length of time and that his back problems caused him to fall on several occasions. Bell also testified that he was unable to read. He said that he had difficulty sleeping and driving due to the back pain and that he had difficulty with shopping trips, using foot pedals, and gripping with his left hand. Bell testified that he has difficulty bending over to pick something up from the floor and that carrying a gallon of milk could cause him pain. On the other hand, Bell said that he mows the lawn on occasion, goes grocery shopping, and rides his motorcycle about twice a week.

Bell's wife also testified at the hearing. She testified that while Bell can read, his problem is really that he does not comprehend what he reads. She also said that Bell spends most of his time at home tinkering in the garage.

Christopher Marquart, M.D., saw Bell on two occasions regarding his back pain. On May 10, 1999, Bell reported that he had been unable to work since February 1999. Bell said that the pain began in the center of his back and radiated over into the right hip and down his leg to the ankle. Bell said that sitting caused him some increased pain but that driving did not seem to give him much of a problem. Bell's wife said that he could perform work such as operating equipment but could not perform heavier exertional activities. Dr. Marquart reported that Bell's gait and station were normal, that he had full motor strength, that his sensory examination was intact, and that his reflexes were symmetrical. Straight-leg raising on the right side was positive for some sciatic-type pain at about 60 degrees. Dr. Marquart examined Bell again on October 12, 1999. Dr. Marquart noted that an MRI showed degenerative disc disease, but did not indicate disc herniation or nerve root compression. Dr. Marquart found no signs of radiculapathy and he concluded that surgery was not

warranted. He suggested a work reconditioning program.

On June 8, 1999, Bell saw Dr. Glass, who performed the prior knee surgeries, regarding complaints of left knee pain. Dr. Glass noted that he had not seen Bell in four or five years and that Bell had been fine until he fell in January 1999. Dr. Glass found that Bell had some tenderness but had full range of motion with no instability. Dr. Glass prescribed Celebrex for medial osteoarthritis indicated by x-rays. At a follow-up examination, Dr. Glass concluded that Bell's left knee pain was likely related to his back complaints and would not be caused by knee osteoarthritis.

Paul Martin, M.D., saw Bell on June 17, 1999. Bell reported back pain on a daily basis radiating into his right leg all the way to the ankle and that heavy lifting, bending, twisting, stooping, prolonged periods of sitting, and standing increased his symptoms. On examination, Dr. Martin noted that Bell had some limitation of back motion, but no muscle spasm. Bell showed decreased strength on the right side with heel/toe walking as well as a mild degree of muscle atrophy on the right calf. There was also decreased sensation in the L5 nerve root distribution on the right side. Otherwise, sensory examination was normal. Straight leg raising was positive on the right side. Dr Martin found that Bell was not physically capable of returning to his former position without restrictions but was capable of performing light work that involved lifting no more than 20 pounds, did not require frequent or repetitive bending, twisting, or stooping, and allowed an alternate sit/stand option.

Two doctors reviewed Bell's records for the state agency and concluded that Bell was able to perform some work with restrictions. On March 14, 2000, David Rath, M.D., reviewed the medical record for the state agency. He concluded that Bell could occasionally lift 50 pounds, could

frequently lift or carry 25 pounds, could stand or walk about 6 hours in an 8 hour workday, and was limited to occasionally climbing ladders and ropes and crawling, but could frequently perform all other postural activities. He also concluded that Bell had no other limitations. Gary Hinzman, M.D., reviewed the record on July 11, 2000, and concurred with Dr. Rath's findings.

Richard Kepple, M.D., examined Bell on March 15, 2000, regarding Bell's complaints of low back pain. Bell reported pain of varying intensity, as well as pain radiating down his right leg and some discomfort in his left leg and foot. Dr. Kepple noted moderate tenderness from L3 to L5. Bell walked with a slight antalgic gait, favoring the right foot. He had difficulty with heel and toe walking. Flexion and extension of the lumbar spine were limited and he had diminished reflexes, but no muscle spasm. Dr. Kepple also noted that Bell had diminished pinprick sensation, but no atrophy and normal strength except for foot dorsiflexion. Dr. Kepple diagnosed lumbar disc herniation bilaterally at L4/5 as well as extensive degenerative disc disease. Dr. Kepple thought that Bell should be referred to a neurosurgeon for treatment, including surgery and extended physical therapy.

In two June 2000 letters and in a February 2000 letter, Dr. Marquart stated that he had last seen Bell in October 1999 and that at that time, Bell exhibited signs of degenerative changes in his back, but there was no condition warranting surgery. Dr. Marquart also stated that to his knowledge, Bell had been unable to work since February 1999.

On November 22, 2000, Bell was evaluated by John McFadden, Psy. D. Dr. McFadden evaluated Bell at the request of Bell's attorney. Bell reported no psychiatric history and no known psychiatric history in his family. Bell indicated a number of stresses and a feeling of uselessness.

Bell also admitted to a number of symptoms, including passive suicide ideation, crying, and difficulty with concentration. Bell was alert, oriented, and cooperative, demonstrated a good capacity for abstract reasoning, and his short term memory appeared intact. He claimed a diminished appetite, although he acknowledged that his weight had increased. Dr. McFadden administered the Minnesota Multiphasic Personality Inventory-2 (MMPI), but there were "notable elevations" on several of the validity scales, which precluded an interpretation of the profile. Dr. McFadden diagnosed dysthymic disorder and recommended that Bell seek professional treatment.

On January 18, 2001, Bell was seen by Michael Platto, M.D., for an electromyogram ("EMG"). Bell complained of pain across both sides of the low back and pain in his left knee. On examination, Dr. Platto found that Bell had full strength. He had decreased pinprick sensation throughout his entire lower left extremity but intact sensation on his right. Deep tendon reflexes were symmetrical. Dr. Platto performed an EMG and nerve conduction studies. There was no evidence of lumbar radiculapathy, but there was a mild to moderate degree of peripheral neuropathy affecting both sensory and motor nerves, which could be consistent with diabetes or kidney disease. Dr. Platto recommended that if Bell was not determined to be a candidate for surgery, that he undergo a work hardening program.

At the administrative hearing, Tim Mahler, M. Ed., testified as a vocational expert ("VE"). He classified Bell's jobs as a rotary dump operator and a locomotive operator as semi-skilled and requiring the residual functional capacity for medium exertion. The VE classified other coal-mining jobs Bell has performed as ranging from unskilled to semi-skilled and requiring the capacity for

medium to heavy exertion. The VE said that any skills Bell acquired from his past jobs would not be transferrable to other jobs. The VE testified that if Bell were limited to performing light work with a sit/stand option that required no frequent or repetitive bending or twisting with limited periods of vibration, he could perform several jobs, including gate guard, desk attendant, small parts inspector, and sorter or grader. The VE also stated that if the person could not read or write, the person could not perform the job of a gate guard, and if hand dexterity were impaired, the sorter and inspector/grader positions could be affected.

Based upon the evidence in the record, the ALJ concluded that Bell was not disabled because he could perform a significant number of jobs identified by the VE.

## II. Standard of Review

We review the ALJ's decision under the same standard of review as the district court: whether the ALJ's decision is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). We may not reverse a decision which is supported by substantial evidence, even if we might arrive at a different conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc). In considering whether the decision is supported by substantial evidence, this court must take into consideration the entire record, including "whatever in the record fairly detracts from its weight." *Id.* at 545-46

(internal quotation and citation omitted). This court does not review the evidence *de novo*, make

credibility determinations, or weigh the evidence. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525,

528 (6th Cir. 1997) (citing *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

## III. Analysis

In order to establish that he is disabled within the meaning of the Social Security Act, a

claimant must show that he has a medically determinable physical or mental impairment that

rendered him unable to engage in substantial gainful activity for at least twelve months. *See* 42

U.S.C. §§ 423(d)(1)(A), (2)(A). The regulations prescribe a five-step sequential evaluation to

determine whether an individual can engage in any substantial gainful activity. *See* 20 C.F.R. §

404.1520(a)(4). The five steps are: (1) if the claimant engaged in substantial gainful activity, he is

not disabled; (2) if the claimant's impairments are not severe, he is not disabled; (3) if the claimant's

impairments meet or medically equal a listed impairment, he is disabled; (4) if the claimant has the

residual functional capacity to perform his past relevant work, he is not disabled; (5) if the claimant

has the residual functional capacity to perform any other substantial gainful activity, he is not

disabled. *See* 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof on the first four

steps, but the burden shifts to the Commissioner at the fifth step. *See Walters*, 127 F.3d at 529. The

ALJ decided the case at step five, determining that Bell has the capacity to perform other substantial

gainful employment.

Bell essentially raises three arguments on appeal. First, he contends that the ALJ erred

factually and legally in finding that he was not "illiterate" under the Social Security Medical-

Vocational Guidelines. Second, he argues that the ALJ erred in finding that his depression was not

severe. Finally, he argues that in determining that he had the residual functional capacity to perform a range of light work, the ALJ misinterpreted the medical opinion of Dr. Marquart and failed to properly consider objective medical evidence in assessing Bell's subjective complaints of pain.

## A.   ALJ's Finding of Literacy

The ALJ found that if Bell in fact had literacy difficulties, he was apparently able to overcome and deal with them.  As support for this conclusion, the ALJ noted that Bell was a high school graduate and had attended one semester of college, had served in the Naval Reserve for two years as a machinery repairman and also in the construction battalion, had been employed for six years as a union organizer, and had served as the mayor and on the council of his village.  The ALJ noted that Bell's work as a union organizer and mayor was inconsistent with his claim that he was illiterate.

Under the Medical-Vocational Guidelines, a finding of "disabled is warranted" for a person of Bell's age and vocational characteristics who is illiterate and limited to light work.  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202(d).   The regulations define illiteracy as "the inability to read or write." 20 C.F.R. § 404.1564(b)(1).  A claimant is considered illiterate "if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name."  *Id.*  "Generally, an illiterate person has had little or no formal schooling."  *Id.*

Bell argues that the ALJ erred because he relied solely upon Bell's years of education without considering other evidence, including Bell's own testimony, showing that Bell's education was not reflective of his reading or writing abilities.  Bell contends that the ALJ failed to properly apply 20 C.F.R. § 404.1564(b), which provides, in part:  "[T]he numerical grade level that you

completed in school may not represent your actual educational abilities. These may be higher or lower. However, if there is no other evidence to contradict it, we will use your numerical grade level to determine your educational abilities."

While there was some evidence in the record tending to support Bell's claim of illiteracy, other evidence supported the conclusion that Bell was able to read and write, with some difficulty, at least to a limited degree. For example, Bell testified that he was unable to read and that he never read a newspaper or a book. He also explained that in spite of his reading deficiency, he was able to graduate from high school because he was good at sports, and when he served as mayor, he largely "hid" his problem by having others read documents and papers to him. On the other hand, Bell stated that he "can sit down and figure out what some things are, other things I just don't understand at all." Bell's wife testified: "[I]t's not that he can't read. The problem is when he – he has to concentrate so much on the words that what he's read doesn't sink in." Moreover, Bell initially stated on a Disability Report that he could read English, and he completed several forms requiring written answers.[1]

The evidence that Bell cites shows that Bell has some difficulty with reading and writing, but it does not compel a conclusion that Bell is illiterate. The ALJ was entitled to consider Bell's own admission that he could figure out certain things, along with the facts that Bell graduated from high school, attended one semester of college, and held several positions that would require at least some minimal ability to read and write, in concluding that Bell was not illiterate under the

---

[1]Bell implies that his wife actually completed the forms, but he relies solely upon unsupported statements in his brief for this assertion.

regulations. *See Range v. Soc. Sec. Admin.*, 95 F. App'x. 755, 757 (6th Cir. 2004) (affirming the ALJ's decision that the claimant had a marginal education where the claimant had a tenth or eleventh grade education, attended mechanics school, and performed semiskilled work all of his life and the only evidence of illiteracy was the claimant's own testimony). Because there was substantial evidence to support the ALJ's conclusion, we must affirm on this issue.

## B.      Severity of Depression

Bell argues that the ALJ erred in concluding that Bell's psychological symptoms did not constitute a "severe" impairment because Dr. McFadden's opinion that Bell suffers from a dysthymic disorder (a type of depression) provided a sufficient basis to conclude that Bell either met the Listing of Impairments for affective disorders or that he was more severely limited than the ALJ found. Bell asserts that the ALJ improperly rejected Dr. McFadden's opinion solely because the MMPI was invalid and that the ALJ should have given Dr. McFadden's opinion greater weight. These arguments are without merit.

In his decision, the ALJ noted that the MMPI was invalid because of notable elevations on at least two of the validity scales. This finding was consistent with Dr. McFadden's own statement that the MMPI could not be interpreted because it was invalid. The ALJ observed that while Dr. McFadden had speculated on the reasons for the deviation in a report written three months later, it did not change the fact that the MMPI was still invalid and could not be considered. However, the ALJ considered Dr. McFadden's mental status findings – that Bell had a good capacity for abstract reasoning, had coherent thoughts, and had no evidence of delusional thinking. The ALJ also noted that while Bell had reported to Dr. McFadden that he had difficulties with concentration and

attention, Bell was able to perform mental calculations and his short-term memory was intact. Observations such as these are relevant to the determination of whether a claimant's mental disorder is severe. *See* 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00(C)(3). As such, they provided substantial evidence supporting the ALJ's conclusion that Bell's dysthymic disorder was not severe.

The ALJ was not, as Bell contends, required to give greater weight to the Psychiatric Review Technique Form (PRTF) completed by Dr. McFadden on the basis of a treatment relationship with Bell. It is true that, generally, reports of physicians who have treated the claimant are entitled to greater weight than reports of non-treating physicians. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981). However, Dr. McFadden was not a treating physician. *See* 20 C.F.R. § 404.1502 (defining "treating source" as "your own physician, psychologist, or other acceptable medical source who . . . has, or has had, an ongoing treatment relationship with you"). At the time Dr. McFadden completed the PRTF, he was not a treating source because he was not treating Bell, and he provided the form following a one-time examination of Bell at the request of Bell's attorney. *See id.* ("We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability."); *Boucher v. Apfel*, No. 99-1906, 2000 WL 1769520, at \*9 (6th Cir. Nov. 15, 2000) (concluding that although the physician examined the claimant on three occasions, he was not a treating source). Furthermore, regardless of whether Dr. McFadden was a treating physician, his opinion was entitled to controlling weight only if it was "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [was] not inconsistent with the other substantial evidence in [the] case

record." 20 C.F.R. § 404.1527(d)(2). There is no indication that Dr. McFadden's opinion was supported by anything other than Bell's self-reports of his symptoms. Such reports alone cannot support a finding of impairment. *See* 20 C.F.R. § 404.1508; *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990) (concluding that the ALJ properly rejected a treating clinical psychiatrist's opinion that the claimant suffered from a severe mental impairment where the psychiatrist's opinion was not supported by clinical test results). Thus, the ALJ did not err in declining to credit Dr. McFadden's opinion.

## C.     Bell's Residual Functional Capacity

Bell argues that the ALJ erred in determining that he had the residual functional capacity to perform a range of light work because the ALJ should have interpreted Dr. Marquart's opinions as concluding that Bell was disabled. We disagree. Dr. Marquart saw Bell twice and never made any medical finding that Bell was disabled. In fact, following the last examination in October 1999, Dr. Marquart remarked that he felt there was nothing else he could do for Bell other than to continue his physiotherapy and place him in an active work-hardening program. Dr. Marquart also reported relatively normal findings: Bell had a normal gait and station; full strength in all motor groups; and the sensory examination was unremarkable. In light of these comments, which suggest that Bell was not disabled, the ALJ reasonably interpreted Dr. Marquart's statements in his reports to the SSA several months later that Bell had been unable to work since 1999 not as a medical determination of disability, but instead as a report on Bell's work history. The ALJ's interpretation was consistent with other evidence in the record showing that Bell could perform a range of light work. For example, the ALJ relied upon the opinion of Dr. Martin that Bell could perform a range of light

work with a sit/stand option. In addition, two agency reviewing physicians concluded that Bell could perform light work. Thus, the ALJ's finding was well supported.

Bell also contends that the ALJ failed to properly consider the objective medical evidence in the record in assessing Bell's complaints of pain. In this circuit, complaints of pain are evaluated pursuant to *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847 (6th Cir. 1986). The first prong of the *Duncan* test requires objective evidence of an underlying medical condition that can be expected to produce pain and other symptoms. Under the second prong, the court must examine whether there is objective medical evidence confirming the severity of the alleged pain or whether the alleged condition is so severe that it can reasonably be expected to produce the alleged pain. *Id.* at 853. Bell argues that the ALJ ignored clinical findings showing that he suffered from muscle atrophy in his knee, diminished sensation, degenerative disc disease, and reduced range of motion in applying the second prong of the *Duncan* test.

Our review of the ALJ's opinion indicates that he did consider and weigh all of this evidence and explained why it did not show a disabling condition. For example, although Dr. Martin's findings included reduced range of motion, some slight atrophy, and some decreased sensation, the ALJ noted that Dr. Martin found that Bell could perform a range of light work with some limitations. The ALJ also considered the MRI results and properly concluded that they did not show a debilitating condition. Moreover, the ALJ found that Bell's complaints were not entirely credible. For instance, the ALJ noted that Bell engaged in a variety of activities, including riding his motorcycle, shopping, running errands, attending high school football games weekly, and performing household repairs, that were inconsistent with complaints of disabling pain. Such

14

activities may be considered "in evaluating complaints of disabling pain or other symptoms." *Bogle v. Sullivan*, 998 F.2d 342, 348 (6th Cir. 1993). The ALJ also considered inconsistencies in Bell's testimony, for example, about his difficulty with driving, suggesting that his complaints were not entirely credible. Thus, the ALJ's credibility finding was based on substantial evidence.

### IV. Conclusion

Accordingly, the district court's judgment is **AFFIRMED.**