NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 14a0606n.06

Case No. 13-6570

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CATHERINE D. GRIFFITH, | ) | **FILED** |
| | ) | Aug 07, 2014 |
| Plaintiff-Appellant, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| COMMISSIONER OF SOCIAL SECURITY, | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | **O P I N I O N** |

BEFORE: GIBBONS and McKEAGUE Circuit Judges, and LAWSON, District Judge.[*]

**McKeague, Circuit Judge.** Catherine Griffith challenges the denial of her application for Supplemental Security Income. Two issues are presented on appeal: (1) whether the administrative law judge improperly concluded that Ms. Griffith does not have a "medically determinable mental impairment" and (2) whether the administrative law judge also erred by relying upon vocational testimony that was allegedly based on inaccurate information. For the following reasons, we **AFFIRM** the decision of the administrative law judge.

---

[*] The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

### I. FACTS

In March of 2010, Catherine Griffith ("Griffith") applied for Supplemental Security Income, claiming that she suffered from bipolar disorder, depression, and nerves. As part of her application, Griffith was evaluated by several psychiatrists and doctors. The Social Security Administration also considered intellectual testing from Griffith's high school and other psychological/medical evaluations. We briefly summarize the various reports considered by the Administrative Law Judge ("ALJ").

In March of 2005, Cassaundra Murray ("Murray"), a certified school psychologist of the Lincoln County Schools, evaluated Griffith's intelligence when she was approximately 16 years old and determined that she fell in the "Below Average" range with a "Full Scale IQ Score" of 62, which falls in the lowest 2% of the population.[1] While noting that Griffith's communication skills were "commensurate with her peers" and that she "was able to successfully solve problems requiring abstract reasoning and auditory short-term memory," Murray indicated that Griffith had a "mild cognitive disability."

Murray also performed an Adaptive Behavior Assessment that tested the daily "skills necessary to function effectively in [Griffith's] environment . . . ." This included testing her "Home Living," "Health and Safety," "Self-Care," and "Self-Direction" skills. Griffith received a composite score of 81, which fell in the "Low Average" range, and as Murray reported, "is not consistent with her overall intellectual functioning . . . ."

On April 26, 2010, Psychiatrist Syed Raza ("Raza") evaluated Griffith and diagnosed anxiety disorder and depressive disorder. Griffith scored "slightly low" in the assessment ratings for societal/role functioning and interpersonal functioning, but displayed no impairment with

---

[1] Murray used the Wechsler Intelligence Scale for Children – Fourth Edition. The Wechsler Intelligence Scale is used as a "measure of general intellectual functioning."

respect to her "daily living/personal care functioning," "physical functioning," or "cognitive/intellectual functioning." In a follow-up appointment on August 2, 2010, Raza noted that Griffith was alert, "oriented to place, person and situation," and had fair judgment, fair insight, and linear thoughts.

Griffith underwent another evaluation on September 9, 2010, at age 21, with Dr. Timothy Baggs ("Dr. Baggs"). During this evaluation, Griffith told Dr. Baggs that she had previously worked part-time at a Kroger's deli, but that this employment had only lasted a few months. Griffith also reported that she held a valid driver's license, though she did not drive much, and indicated that she was able to perform common household tasks, to care for her personal hygiene, to manage her personal finances, and to shop for herself. When asked about her social interactions with others, Griffith indicated that her family relationships were "alright," but expressed "difficulty in initiating and maintaining social relationships."

In assessing her mental status, Dr. Baggs observed that Griffith "appeared to be experiencing moderate to possibly moderately severe psychological distress in the form of depression," but noted that her "thought processes did appear to be rational," "[t]here was no suggestion of mental confusion or disorientation," and that "[i]nsight and personal judgment were deemed fair." He ultimately estimated that her intellectual functioning fell in the low average range. Dr. Baggs further opined that Griffith "had the ability to understand and remember simple instructions," that "[s]he seemed capable of maintaining sustained concentration and persistence in completion of tasks in a normal amount of time," and that she "may experience moderate difficulty relating appropriately with people in either a workplace environment or social setting."

Dr. Ann Demaree, Ph.D. ("Dr. Demaree") reviewed the Baggs Report and completed a Mental Residual Functional Capacity Assessment on September 23, 2010. In Section III of the assessment, Dr. Demaree concluded that Griffith remained able to "understand/complete simple, routine tasks;" to "relate adequately to peers and supervisors where she has casual contact and no public contact;" and to "adapt in a task oriented work setting with few changes in routine." Dr. Jay Athy, Ph.D. ("Dr. Athy") reviewed the Baggs Report and found the same moderate limitations on Griffith's abilities.

After reviewing the entire record and following a hearing where Griffith and a vocational expert testified, the ALJ issued a decision on September 13, 2011. At the time of the decision, Griffith was twenty-two years old, had completed eleventh grade in a special education program, and had limited work experience in the form of her part-time employment at the Kroger deli. Taking all of this information, as well as the various psychological and medical reports into account, the ALJ determined that Griffith suffered from anxiety disorder and depressive disorder that were "severe" in combination, but further determined there was no medically determinable mental impairment with regard to her intellectual functioning. The ALJ further concluded that Griffith had the residual functional capacity to perform "work that involves only simple, routine tasks with no more than casual contact with coworkers and the general public" with a "task-oriented setting that involves few changes in routine." Then relying upon the testimony of a vocational expert, who indicated that substantial jobs existed in the national economy for a person with these limitations, the ALJ determined that Griffith was not disabled and denied her Supplemental Security Income.

Griffith subsequently requested review from the Appeals Council, which was denied on December 12, 2012. Having exhausted her administrative remedies, Griffith brought suit in the

United States District Court for the Eastern District of Kentucky and moved for summary judgment. On October 7, 2013, the district court denied the motion and affirmed the ALJ's decision. Griffith appeals the ALJ's decision and the district court's affirmance.

## II.    STANDARD OF REVIEW

This court reviews a district court's decision on a social security case *de novo*. *Rabbers v. Comm'r Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009). Our review is limited, however, to whether the Commissioner's decision "is supported by substantial evidence and was made pursuant to proper legal standards." *Id.* (quoting *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Heston v. Comm'r Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (internal citation and quotation marks omitted). Ultimately, if the commissioner's decision is based upon substantial evidence, we must affirm even if we would have ruled differently in the first instance. *See Ealy v. Comm'r Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).

## III.    ANALYSIS

Under the Social Security Act, a person qualifies for supplemental security income if they have a disability. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Simpson v. Comm'r Soc. Sec.*, 344 F. App'x. 181, 188 (6th Cir. 2009) (quoting 42 U.S.C. § 423(d)(1)(A)). A five-step sequential evaluation is used to determine if a claimant has established a disability under 20 C.F.R. § 416.920.[2] While the claimant bears

---

[2] Our case law clearly sets outs the five-step evaluation process:

the burden through step four of proving the existence and severity of limitations caused by her impairments, the burden shifts to the Commissioner at step five to identity a significant number of jobs in the national economy that the claimant can perform. *See Jones v. Comm'r Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003); 20 C.F.R. § 416.912(a). Here, Griffith contends that the ALJ: (1) erred when he failed to find that Griffith has a medically determinable mental impairment with regard to her intellectual functioning, and (2) further erred by relying upon vocational testimony that was allegedly based on inaccurate information. We begin with the first contention.

### 1. Does the complainant have a medically determinable mental impairment with regard to her intellectual functioning?

Griffith alleges that she was disabled on the "basis of major depression, anxiety, and borderline intellectual functioning," and that the ALJ erred by failing to find that she has a medically determinable mental impairment based on her low I.Q. In order to be classified as disabled, Griffith must "have a severe impairment," which "significantly limits [her] physical or

---

First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (*citing* 20 C.F.R. §§ 404.1520(b) and 416.920(b)(2000)). Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Abbott,* 905 F.2d at 923.

*Heston*, 245 F.3d at 534.

mental ability to do basic work activities." 20 C.F.R. § 416.920(c). A severe mental impairment is "established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a complaint's] statement of symptoms." 20 C.F.R. § 416.908. Basic work activities include physical and mental tasks, ranging from walking and standing to remembering simple instructions. 20 C.F.R. § 416.921. Griffith bears the burden of showing a severe impairment by medical evidence. 20 C.F.R. § 416.908.

The ALJ rejected Griffith's argument because the record as a whole indicated that her intellectual functioning was not as low as her I.Q. score indicated.[3] Griffith counters that the ALJ has confused intellectual ability with adaptive functioning, which generally references a "claimant's effectiveness in areas such as social skills, communication, and daily living skills." *West v. Comm'r Soc. Sec.*, 240 F. App'x 692, 698 (6th Cir. 2007). In actuality, Griffith has conflated the existence of a medically determinable mental impairment with a low I.Q. score. The ALJ's assessment does not begin and end solely on the basis of I.Q.

While it is well established that an intelligence score may be helpful in assessing whether an individual has a medically determinable mental impairment, it is not the sole determinative criteria, and notably the complainant has not cited a single case where a low I.Q. score was the sole basis for finding an intellectual disability. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 (D)(6)(a); 20 C.F.R. § 404.1520a. As the C.F.R. clarifies, "intelligence tests are only part of the overall assessment." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 (D)(6)(a). "The narrative report that accompanies the test results should comment on whether the I.Q. scores are

---

[3] Griffith claims that the "Commissioner conceded in her brief to the District Court that the ALJ's finding of 'no medically determinable intellectual impairment' was in error." This is simply incorrect. The Commissioner never conceded this point, but instead asserted "the ALJ's characterization of Plaintiff's intellectual functioning as 'not medically determinable' *is no more than* harmless error." The Commissioner has consistently argued that the ALJ's finding was not in error, but that even if it was erroneous, that the error was harmless.

considered valid and consistent with the developmental history and *the degree of functional limitation.*"  *Id.*  (emphasis added).  Case law is consistent on this point.  As we emphasized in *Brown v. Secretary of Health & Human Services*:

> The I.Q. score must reflect the plaintiff's true abilities as demonstrated by his or her performance at work, household management and social functioning.  *The regulations do not limit the question of validity to test results alone in isolation from other factors.*  In assessing the validity of a claimant's I.Q., [i]nformation from both medical and nonmedical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning; concentration, persistance [sic] and pace; or ability to tolerate increased mental demands (stress).

948 F.2d 268, 269 (6th Cir. 1991) (internal citations and quotation marks omitted) (emphasis added).  Thus, both the C.F.R. and the case law indicate that I.Q. scores should be read as part of an overall assessment that includes the individual's adaptive functioning and daily activities.

Here, the ALJ acknowledged Griffith's low I.Q. of 62, but concluded that this test, which was performed when Griffith was 17 years-old, was not representative of her actual intellectual functioning.  In support of this determination, the ALJ noted that the impact statement following Griffith's I.Q. score described her as having only a "mild cognitive disability."  The ALJ also referenced Griffith's concession that she did not qualify for "intellectual disability," which is a listed disorder under 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05, because she "did not have significant deficits in adaptive functioning prior to the end of the development period."[4]  While

---

[4] Griffith conceded this point when the ALJ inquired as to why she was not pursuing an "Intellectual Disability" determination under 20 C.F.R. Pt. 404, Subpt. P, App. 1.  "Intellectual Disability" is a term of art that "refers to significantly subaverage general intellectual functioning *with deficits in adaptive functioning initially manifested during the developmental period* (before age 22)."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.  Griffith indicated that "while there were no reservations about the validity of the school age I.Q. scores, the school age test results also showed that the claimant did *not have significant deficits in adaptive function prior to the end of the development period*, as would be required to satisfy the diagnostic description in 12.00 of of [sic] 20 C.F.R. Part 404 . . . ."  Thus, while Griffith concedes, as she must, that she lacks an "intellectual disability" because of her adaptive functioning, she nonetheless argues that her

Griffith's concession is not dispositive on the question of whether she suffered from a medically determinable mental impairment, the ALJ did not err in taking the concession under consideration when assessing her intellectual functioning.

Moreover, there is ample evidence in the record as a whole and elsewhere in the ALJ's opinion that Griffith had a higher degree of intellectual functioning than her single I.Q. score indicated. For example, in section II of the order, the ALJ extensively discussed Griffith's normal level of adaptive functioning, including her ability to count change, perform household tasks, live independently, manage her food stamp benefits, maintain personal hygiene, drive a car, use a home computer, and maintain relationships with various extended family members. Along with those abilities, the ALJ also noted Griffith's only slightly low interpersonal functioning, her appropriate behavior during her various interviews, and her ability to answer questions without difficulty during her disability interview.

In her reply brief, Griffith counters that several cases in the Sixth Circuit have found that adaptive abilities may be consistent with an I.Q. in the 60s. *See, e.g.*, *Mowery v. Heckler*, 771 F.2d 966, 971 (6th Cir. 1985) (finding reliance on work history alone could not discount the individual's I.Q. of 66); *Brown*, 948 F.2d at 270 (finding that claimant's abilities to use public transit, possess a driver's license, visit friends, and make change were not inconsistent with an I.Q. of 68). While this is true, all of the cases that Griffith has cited involved an analysis of 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(c), which Griffin has conceded is not at play in the present case. Additionally, Griffith has not offered an alternative to section 12.05(c), under which she would qualify as mentally impaired. Perhaps, most importantly, the ALJ in the

cognitive impairment should still be recognized as a medically determinable impairment. Again, however, Griffith has failed to cite to any cases or regulations that indicate that an I.Q. score like hers, by itself, qualifies as a medically determinable impairment.

present case, unlike in the cited cases, did not rely solely on Griffith's adaptive abilities for his

conclusion that her intellectual disability did not qualify as "severe."

In particular, the ALJ expressly discussed the various psychological evaluations which

indicated that Griffith only had a "mild cognitive impairment" or was "below average." *See* R.

4-1, Baggs Report, PageID # 290 ("Griffith's intellectual functioning likely fell in the Low

Average range."); Murray Report, PageID # 217, 219 (describing Griffith as possessing a "mild

cognitive disability" and further indicating that her "adaptive behavior [was] not consistent with

her overall intellectual functioning, which fell in the below average range"); Raza Report,

PageID # 250, 266 (indicating Griffith did not have a "cognitive/intellectual" functional

impairment and estimating Griffith's intelligence to be merely "Below Average," instead of

"Borderline Intellectual Functioning" or "Mental Retardation."); Demaree Report, PageID # 299

(failing to mention a cognitive impairment despite prompting from the psychiatric review form).[5]

The opinions of these medical professionals consistently indicated that Griffith fell in the below-

average range for general intelligence but eschewed a direct finding of borderline intellectual

functioning or mental retardation.  Taken together, these various psychological opinions in

combination with the extensive evidence of Griffith's adaptive functioning provide substantial

evidence for the ALJ to have concluded that Griffith did not have a severe mental impairment

with regard to her intellectual functioning.  *See Longworth v. Comm'r Soc. Sec.*, 402 F.3d 591,

---

[5] Raza additionally indicated in his diagnostic impression "R/O Borderline Intellectual Functioning."  The district court believed that this meant "any borderline intellectual functioning had been ruled out for Griffith."  Griffith argues that Raza's note was intended as a differential diagnosis, meaning borderline intellectual functioning needed to be "ruled out."  We do not rely on the meaning of "R/O" for purposes of our judgment, and therefore, we need not definitively resolve this dispute.  But we do note that elsewhere in his functional assessment, Raza indicated that Griffith did not suffer from a cognitive/intellectual functioning impairment.  Raza also estimated, when assessing Griffith's "estimated intelligence," that she was only "below average," which is a category above "borderline intellectual functioning" and "mental retardation."  Thus, the evidence supports the district court's interpretation of the meaning of "R/O."

597 (6th Cir. 2005) (relying on prior work experience and medical testimony to reject claimant's argument that her 51 I.Q. alone placed her in the bottom ten percent of the population in intelligence level).

Next, we address whether the ALJ impermissibly substituted his own medical judgment for those of trained professionals when he considered Griffith's adaptive functioning in assessing her intellectual functioning. *See Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006). Again, intellectual functioning is determined not just by considering raw I.Q. but more holistically taking into account the degree of functional limitation. Moreover, while the ALJ must base his findings of fact and legal conclusions on medical information that has been provided, we note that solicitation of an expert medical opinion is discretionary. *See* 20 C.F.R. § 416.927(e)(2); *Simpson*, 344 F. App'x at 189 (discussing 20 C.F.R. §§ 404.1527(f)(2)(iii) and 416.927(f)(2)(iii)).

In *Foster v. Halter*, 279 F.3d 348, 356 (6th Cir. 2001), we held that the ALJ did not abuse his discretion in denying a request for additional expert testimony when there was sufficient evidence in the record for the ALJ to evaluate the claimant. *See also Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination."). Similarly here, the record was amply developed by the psychological reports from Murray, Raza, Baggs, Demaree, and Athy. Moreover, the data consistently indicated that Griffith had low intelligence and a comparatively higher degree of adaptive functioning, making solicitation of additional medical opinions unnecessary. As the ALJ properly reviewed and weighed the reports

to make a legal determination that is supported by substantial evidence, the assertion that the ALJ was "playing doctor" is unsupported.

For all of these reasons, we conclude that substantial evidence supports the ALJ's determination that Griffith did not suffer from medically determinable mental impairment with regard to her intellectual functioning.

### 2. Did the ALJ improperly rely on expert testimony from a vocational expert that was based on a flawed hypothetical?

In assessing at step 5 the availability of suitable work for a complainant, the ALJ may rely upon the testimony of a vocational expert. Such testimony can constitute substantial evidence, but it "must be given in response to a hypothetical question that accurately describes the plaintiff in all significant, relevant respects." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). Failure to describe a complainant's limitations in all relevant respects, especially where the ALJ otherwise relies upon an expert's assessment of a claimant's limitations, can result in a finding of error. *See Ealy*, 594 F.3d at 516.

Here, the ALJ asked the vocational expert to assume a younger individual with an eleventh grade education, no exertional limitations, no more than occasional contact with co-workers and supervisors, and no contact with the general public. The ALJ also indicated that the person would be limited to one, two, and three-step instructions and would be required to work in a task-oriented setting with few changes in routine. Based on this hypothetical, the vocational expert determined that three jobs—kitchen helper, janitor, and laundry worker—existed in sufficient numbers in the national economy for an individual with such limitations.

Griffith argues that the ALJ's hypothetical was flawed because it failed to take into account other relevant restrictions. Both Drs. Demaree and Athy concluded in Section I of their Mental Residual Functional Capacity Assessment that Griffith would experience moderate

difficulty in a variety of areas, including working in coordination with or in proximity to others, completing a normal work day and performing work at a consistent pace without an unreasonable number of rest periods, and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. Griffith contends that these restrictions were relevant and should have been provided to the vocational expert.

We are not persuaded. Claimant concedes, as she must, that Section I of the Mental Residual Functional Capacity Assessment is a "worksheet" and "does not constitute the [Residual Functional Capacity] assessment." As the actual assessment document itself explains, Section I is intended for evaluators to record "summary conclusions," while the "[d]etailed explanation of the degree of limitation for each category . . . as well as any other assessment information . . . is to be recorded in Section III." The webpage for the Department of Social Security, to which Griffith draws our attention, also confirms that "Section I is merely a worksheet . . . and does *not* constitute the RCF assessment." *POMS DI 24510.060 Mental Residual Functional Capacity Assessment* (last visited 7/18/2014), *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0424510060 (emphasis added). In contrast, Section III is where "the actual [Residual Functional Capacity] assessment is recorded" and explains "the conclusions indicated in section I, in terms of the extent to which these mental capacities or functions could or could not be performed in work settings." *Id.*

These multiple sources make clear that Section III not only provides a more thorough and detailed assessment than the checklist in Section I, but also reflects the doctors' *actual findings* regarding their understanding of Griffith's work-related limitations. Additionally, the hypothetical that the ALJ ultimately posed to the vocational expert closely tracked the limitations detailed in Section III of the functional capacity assessment. It is apparent that the ALJ, in

relying solely on the Section III analysis, was not acting arbitrarily or merely cherry picking from the record, as Griffith contends, but was properly applying the doctors' actual findings. We therefore conclude that the ALJ did not err in creating a hypothetical that solely referenced the Section III assessment. *See Webb. v. Comm'r Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (indicating that "a hypothetical question need only reference all of a claimant's limitations, without reference to the claimant's medical conditions."). Our determination on this point is consistent with several district courts and with the Third Circuit. *See, e.g.*, *Smith v. Comm'r Soc. Sec.*, 631 F.3d 632, 636–37 (3d Cir. 2010) (holding, and listing cases, that indicate that a complainant cannot rely on the worksheet component of the Mental Residual Functional Capacity Assessment to contend that a hypothetical question was deficient).

Griffith next contends that the ALJ failed to advise the vocational advisor as to all of the restrictions identified by Dr. Baggs. For example, Dr. Baggs indicated that Griffith "*may* experience moderate difficulty relating appropriately with people in either a workplace environment or social setting" and that her "ability to adapt and respond effectively to pressures found in normal work settings *seemed* moderately less to possibly much less than the average worker." In comparison, the ALJ indicated in his hypothetical that the worker should have "no more than occasional contact with coworkers and supervisors, [and] no contact with [sic] general public."

Both the ALJ's opinion and the Baggs Report speak to Griffith's social difficulties and problems adapting to the work environment, but while the Baggs Report speaks in terms of possible restrictions—the claimant "may" have or "seems" to have problems—the ALJ sought to provide the vocational expert with more concrete information regarding Griffith's limitations. Thus, the distinction between the ALJ's language and the Baggs report is partially attributable to

the need to provide the vocational expert with actionable guidance, and as this circuit has previously indicated, "a hypothetical question may be incomplete, yet still accurately portray a claimant's limitations." *Brock v. Comm'r Soc. Sec.*, 368 F. App'x 622, 626 (6th Cir. 2010).

But even assuming that the ALJ's language is less restrictive than the language from the Baggs Report, the ALJ was not required to discuss the Baggs Report verbatim. The opinion of a nontreating source or one-time examiner, such as Dr. Baggs, is not entitled to the degree of deference that is granted to a treating physician. *See Smith v. Comm'r Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Moreover, the ALJ is not required to simply accept the testimony of a medical examiner based solely on the claimant's self-reports of symptoms, but instead is tasked with interpreting medical opinions in light of the totality of the evidence. *See* 20 C.F.R. § 416.927(b); *Bell v. Barnhart*, 148 F. App'x 277, 285 (6th Cir. 2005) (declining to give weight to a doctor's opinion that was only supported by the claimant's reported symptoms). The ALJ did precisely this.

The ALJ acknowledged Griffith's claim that her ability to respond to normal work stress was moderately less to possibly much less than the average worker, but then rejected this argument in light of the totality of the evidence. The ALJ first noted that Dr. Baggs found that Griffith was capable of understanding and remembering simple instructions; that she was capable of maintaining sustained concentration and persistence to complete tasks; and that she was oriented to person, place, and time with intact memory. The ALJ then turned to Dr. Demaree's conclusion in her functional capacity assessment that Griffith remained able to "understand/complete simple, routine tasks" and "relate adequately to peers and supervisors *where she has casual contact and no public contact*." Dr. Athy affirmed Dr. Demaree's assessment. For purposes of his vocational expert hypothesis, the ALJ effectively co-opted the

language from Dr. Demaree's Functional Capacity Assessment. The ALJ finally noted that Griffith did not exhibit any unusual or inappropriate social behavior during either her disability interview or her disability hearing, although both had the "potential to increase social stress."

Based on this evidence—the opinions of two doctors that Griffith could "relate adequately to peers" under limited circumstances, the testimony of a third doctor regarding Griffith's general functional capacity, and Griffith's conduct throughout the proceedings—the ALJ crafted a hypothetical restriction that he believed best matched the totality of the evidence and complainant's medical conditions. *See Webb*, 368 F.3d at 633 (rejecting the claim that a hypothetical must include a listing of all of the complainant's medical conditions). As substantial evidence supports the ALJ's hypothetical, the ALJ did not err in failing to describe the exact restrictions referenced by Dr. Baggs to the vocational expert.

Lastly, Griffith attacks the ALJ's hypothetical on the grounds that it failed to indicate that Griffith's learning ability falls within bottom decile of the national population. Because all of the jobs put forth by the vocational expert required a General Learning Ability[6] above the bottom decile, Griffith argues that the vocational expert should have been advised of her capability. *See, e.g.*, *Frazee v. Barnhart*, 259 F. Supp. 2d 1182, 1200–01 (D. Kan. 2003) (indicating that the ALJ should have listed the plaintiff's I.Q. of 79 as an impairment); *Sizemore v. Astrue*, No. 09–cv–109–KKC, 2010 WL 3001711, at *9 (E.D. Ky. July 28, 2010) (indicating that borderline intellectual functioning was a severe impairment that should be included in the hypothetical to the vocational expert).

---

[6] General Learning Ability refers to "aptitude ability" or "[t]he ability to 'catch on' or understand instructions and underlying principles; the ability to reason and make judgments." *Gibson v. Astrue*, No. CV 06-5046 JC, 2008 WL 5101822, at *3 FN6 (C.D. Cal. Nov. 30, 2008). The Dictionary of Occupational Titles, which is commonly relied upon by ALJs in evaluating whether a claimant can perform other work, indicates the General Learning Ability that is required for each job.

Griffith's argument fails for a number of reasons. Leaving aside the fact that Griffith improperly conflates I.Q. with General Learning Ability,[7] she has provided no evidence apart from her I.Q. to demonstrate that her General Learning Ability fell within the bottom decile of the general population. In contrast, the ALJ referenced substantial evidence for his conclusion that Griffith's General Learning Ability did not fall within the bottom decile. Many of these points are familiar by now. The ALJ thoroughly discussed the Murray Report, acknowledging that Griffith's cognitive skills were below her peers but that her verbal and nonverbal skills were average. The ALJ additionally noted that Griffith's adaptive behavior assessment was deemed "average" and that the longitudinal record established "that the claimant is able to function independently, read most things, work when she chooses, maintain and operate her own vehicle and deal with simple instructions, [and that] her most recent mental health treatment notes reflect no evidence of impairment in the area of daily living/personal care." The record supports each of these conclusions.

Moreover, as discussed previously in section one above, the ALJ had substantial evidence to conclude that Griffith had not demonstrated a medically determinable intellectual impairment. Because Griffith's impairment was not determined to be "severe," the ALJ was not required to reference it in his hypothetical question to the vocational expert. *See Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) ("Finally, the hypothetical question may omit non-severe impairments, but must include those that the ALJ finds to be severe."); *Benenate v. Schweiker*,

---

[7] *See, e.g.*, *Hintersteiner v. Astrue*, No. 5:11-00240, 2013 WL 1337375, at *4 (S.D.W. Va. Mar. 29, 2013) (finding "that Claimant has offered no authority that the general learning ability in the DOT correlates to an I.Q. score."); *Rubalcava v. Astrue*, No. CV 11-9393-PJW, 2012 WL 3656430, at *1 (C.D. Cal. Aug. 24, 2012) ("The general learning ability aptitude scale is not comparable to I.Q."); *McNemar v. Astrue*, No. 1:10-CV-2079, 2011 WL 5554051, at *5 (N.D. Ohio Aug. 29, 2011) (similar); *Wilson v. Astrue*, 834 F. Supp. 2d 1295, 1303 (N.D. Okla. Nov. 30, 2011) (similar); *Gibson v. Astrue*, No. CV 06-5046 JC, 2008 WL 5101822, at *5–6 (C.D. Cal. Nov. 30, 2008) (similar).

719 F.2d 291, 292 (8th Cir. 1983) (similar).  Griffith acknowledges that her reasoning relies on a determination that the ALJ erred in not concluding that she suffered from a medically determinable intellectual impairment.  Thus, as her first claim falls, so does her second.

## IV.    CONCLUSION

For the aforementioned reasons, we **AFFIRM** the district court's grant of summary judgment and the decision of the administrative law judge.